JOSEPH LEBLANC *vs.* FORD MOTOR COMPANY.

Worcester. May 7, 1963. — June 6, 1963.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & REARDON, JJ.

*Negligence,* Manufacturer, Motor vehicle. *Evidence,* Opinion: expert; Hypothetical question. *Practice, Civil,* Comment by judge.

A finding of negligence of a manufacturer of a new automobile having an automatic transmission, purchased from the manufacturer by a dealer, toward an employee of the dealer was warranted by evidence that four months after delivery to the dealer the employee drove the automobile within a few feet of a closed garage door, stopped it on an apron sloping up slightly to the door, "put the selector [lever] in 'Neutral' . . . brought the hand brake up," got out of the automobile, leaving the motor running, went forward to open the garage door, and was then struck and pinned against the garage by the automobile, which had moved forward with its motor racing; that when the employee's foreman got into the automobile immediately after the accident the selector lever "was in neutral"; that the automobile would not have moved forward with the selector lever in neutral in the absence of defects in the clutch or linkage operating the transmission; and that in the interval between delivery to the dealer and the accident the automobile had been stored on the dealer's premises and merely moved around thereon. [229–231]

The cause of an automobile with an automatic transmission moving forward and striking a person in its path when the selector lever operating the transmission was in the neutral position and the motor was running was a proper subject of expert testimony. [231–232]

Certain facts omitted from a hypothetical question to an expert witness were not so significant that their omission made the question improper or required striking the answer. [232]

There was no error at the trial of an action in the judge's refusal to strike a comment by an expert witness amplifying earlier testimony or in allowing use of a model by the witness for a demonstration. [232]

A possibly misleading comment by the judge at the trial of an action which he could reasonably have thought he had sufficiently corrected after objection in view of absence of renewed objection was not prejudicial in the circumstances. [233]

TORT. Writ in the Superior Court dated September 16, 1959.

The action was tried before *DeSaulnier, J.*

*Stanley B. Milton* (*Robert C. Milton* with him) for the defendant.

*Thomas S. Carey* for the plaintiff.

CUTTER, J. LeBlanc obtained a verdict in this action to recover for injuries suffered when he was struck by an automobile. It was alleged that the vehicle had been manufactured negligently by the defendant (Ford). Ford has argued various exceptions, including those (a) to the denial of its motion for a directed verdict, and (b) to the admission of expert testimony. The evidence is stated in its aspect most favorable to LeBlanc.

LeBlanc was employed by a Ford dealer. On September 27, 1958, he was given by one Godish, his foreman, the keys to a new nine-passenger automobile which the dealer had sold but had not yet delivered. LeBlanc was told to clean the automobile which was then standing near a driveway leading from the street to the back of the dealer's garage.

LeBlanc unlocked the door of the automobile, which had an automatic transmission. The "car was in neutral . . . with the hand brake on; . . . he turned the key and pressed on the accelerator." When the motor started, "he had it run for a while . . . [then] put it in drive and release[d] the hand brake." He proceeded to a point about eight feet from the garage door on an "apron . . . located directly in front of the doorway." Then "he stepped on the . . . foot brake and stopped the car . . . put the selector in

'Neutral' . . . brought the hand brake up[1] . . . opened the car door and got out," leaving the motor running.

As LeBlanc moved "to open the garage doors," he "observed a piece of glass on the apron [and] bent down to pick it up." Over the sound of the motor he "heard a click . . . turned around, and the car was already on" him. The automobile, with its motor racing, pinned his right leg at the corner of the garage building, injuring him seriously. One of the sliding garage doors was banged in and knocked off its roller which "was cemented into the . . . floor." LeBlanc was not able to move the automobile at all, even with the help of Godish, who came to his assistance.

Godish "jumped in the car and backed it off [about seven or eight feet], and LeBlanc fell to the ground. . . . [W]hen . . . [Godish] got into the car . . . he looked at the selector lever and it was in neutral." He put it in reverse to back the vehicle, did not remember applying or moving the hand brake, and "didn't notice whether the brake was on or off." He stopped the automobile "partly by the [mechanical] foot brake; the car seemed as though it stopped by itself . . . when he took the foot off the gas pedal." He "put the car in 'Park' and shut off the motor."

The dealer had purchased this automobile from Ford on May 16, 1958, and it had been delivered by trailer truck on May 19, "already greased, oiled and gassed." Upon delivery, some representative of the dealer "would go around the car" to check for "scratches or dents," but no inspection was then made of the motor or operating equipment connected with it. Automobiles, so delivered to the dealer, were stored on the dealer's premises until sold and were moved "quite frequently" around the premises, which included an unfenced area across the street, where LeBlanc himself first saw this vehicle.

---

[1] LeBlanc testified (a) that he "brought the hand brake [up] 'about mid-stroke, that is quite a long stroke so it wouldn't back off the apron' . . . enough . . . to hold it in a stationary position" or "say half way"; and (b) that the motor would not start with the selector lever in a drive position.

The automobile was sold "as a new car." It "was never placed as a demonstrator." No available record showed what was done to the vehicle before it was sold. The normal procedure was that a new automobile was "serviced before it . . . [was] cleaned." Cleaning and washing "are the last jobs before delivery." There was testimony, however, that this automobile was to be "serviced" that afternoon after LeBlanc finished cleaning it. Inspection prior to delivery includes the shifting levers. After the sale, at the "thousand mile service," the dealer found a defect of factory origin in the water pump. There was no testimony that any other mechanical defect was found before or after the sale to the customer.

From the point where LeBlanc left the automobile before the accident the ground sloped up slightly and uniformly toward the garage door. The front wheels of an automobile seventeen feet in length, placed on the apron seven or eight feet from the garage entrance, would be about an inch above the rear wheels.

One Dupont, an expert witness called by LeBlanc, testified that the selector lever of the automobile, below the steering wheel, is connected to the transmission by a link from the bottom of the steering post. All "working parts of the transmission are encased inside a metal housing."

A hypothetical question to Dupont, among other things, assumed that LeBlanc left the selector lever with the indicator showing it in neutral position and that Godish so found it. Dupont stated that for the automobile "to move ahead the clutch will be on either through a malfunction in the clutch itself or from some outside force such as a wrong or malfunctioning linkage." He went on to say, "If the unit is in neutral . . . on either level or an up-grade . . . the car cannot move forward unless there is a clutch applied . . . . If we have the clutch applied through its own means such as a malfunction or sticky clutch or through linkage out of adjustment, and if we have a carburetor which is racing, which this car should have been . . . then we have met all the conditions for the car to move for-

ward.'' A clutch, he said, ''consists of a pack of clutch discs,'' which would have ''either four or five drive members, depending on the model, and these rotate within one another at very close tolerances. If one or more of any of these members were bent or warped they would be pressed against the next one which in turn would press all the way through the clutch pack . . . . This would, in effect, apply the clutch not hydraulically but through malfunction; then we make the conditions for making this car move. . . . With the motor racing [as had been testified] it would indicate a cold motor and that the carburetor was running on fast idle.'' A ''[f]aulty adjustment of the linkage could be caused by the linkage from the bottom of the steering post or the transmission being adjusted so that the arm is either too long or too short; then the . . . position in the transmission would not be corresponding with the selector pin,'' which might read ''Neutral,'' when the transmission was not in neutral but in ''Drive.'' He demonstrated these possibilities from models. Either faulty conditions in the clutch or in the linkage, he said, could ''cause a car to move forward under the conditions . . . explained . . . in the hypothetical question.'' His opinion would be that the ''more probable'' cause ''in this particular case'' would be ''the clutch pack itself, either . . . foreign material inside of it, or warped or sticky plates.''

1. Ford contends that the mere happening of the accident did not constitute proof (a) that Ford, as manufacturer, was negligent in that it knew or should have known that the automobile was defective or would become so (see *Carter* v. *Yardley & Co. Ltd.* 319 Mass. 92, 96; *Ricciutti* v. *Sylvania Elec. Prod. Inc.* 343 Mass. 347, 352; Restatement: Torts, §§ 388 [and 1948 Supp.], 395), or (b) that the automobile's condition had not changed after it ceased to be within Ford's control in May. See *Evangelio* v. *Metropolitan Bottling Co. Inc.* 339 Mass. 177, 183; *Selissen* v. *Empire Bottling Co. Inc.* 343 Mass. 779. The *Yardley* case establishes that Ford, as manufacturer, with respect to persons who might use the automobile, had a duty of care in

its manufacture and inspection. If the automobile in fact was delivered to the dealer in a condition where, with the selector indicator in the "neutral" position, the clutch would operate the transmission (if the motor was running) and drive the automobile, we think that the jury could reasonably infer (1) that the automobile had been negligently manufactured or inspected by the manufacturer and (2) that such a defect should have been discovered by reasonable inspection and road testing. Such an inference would be permissible if this condition was found to exist immediately or shortly after delivery by the manufacturer. *Pierce* v. *Ford Motor Co.* 190 F. 2d 910, 912–913 (4th Cir.), cert. den. sub nom. *Ford Motor Co.* v. *Pierce,* 342 U. S. 887. *Markel* v. *Spencer,* 5 App. Div. 2d (N. Y.) 400, 401, 403–404, affd. without opinion, 5 N. Y. 2d 958. See *Pelland* v. *D'Allesandro,* 321 Mass. 387, 389; *Poulin* v. *H. A. Tobey Lumber Corp.* 337 Mass. 146, 148–149; *Brennan* v. *Arlington Gas Light Co.* 341 Mass. 679, 683.[2]

The *Yardley* case did not relieve LeBlanc of the burden of proving (see the *Ricciutti* case, 343 Mass. 347, 352) that a defect attributable to Ford's negligence caused the injury or that after Ford "surrendered control of the . . . [automobile, it] had not been improperly handled by himself or" others. See the *Evangelio* case, 339 Mass. 177, 183. There undoubtedly could have been tampering with, or abuse of, exposed portions of the linkage between the selector lever and the transmission during the four months while the automobile was stored on the dealer's lot. Interference with the encased transmission, of course, was less probable. In the absence, however, of some specific evidence to the contrary, the jury could reasonably regard it as unlikely that there would be tampering with the selector mechanism

---

2 See also *Hill* v. *Associated Transport, Inc.* 345 Mass. 55, 58; *Peterman* v. *Indian Motorcycle Co.* 216 F. 2d 289, 292 (1st Cir.); *Alexander* v. *Nash-Kelvinator Corp.* 261 F. 2d 187, 189–190 (2d Cir.); *Grey* v. *Hayes-Sammons Chem. Co.* 310 F. 2d 291, 296–299 (5th Cir.); *Becker* v. *American Airlines, Inc.* 200 F. Supp. 839 (S. D. N. Y.); *Frumer* and Friedman, Products Liability, § 12.03 [9]; Hursh, Products Liability, § 2.119. Cf. *Perry* v. *Richards Chevrolet, Inc.* 344 Mass. 356, 358; *Pellegatti* v. *Pellegatti,* 345 Mass. 591, 593–594.

or that the minor use and moving of a new automobile stored on a dealer's lot would materially change the condition of the vehicle from that in which it was delivered or would result in damage to, or maladjustment of, a properly made and inspected new vehicle. Cf. *Jastrzembski* v. *General Motors Corp.* 100 F. Supp. 465, 466 (E. D. Pa.), where, in similar circumstances, recovery was denied to one who had operated a new automobile 15,000 miles before an accident without any difficulty with the hydramatic transmission. Cf. also *McNamara* v. *American Motors Corp.* 247 F. 2d 445, 448–450 (5th Cir.), where the evidence was held not sufficient to show that an automobile, which had been driven 2,500 miles, was in a defective condition before the accident; *Kelly* v. *Otis Elevator Co.* 283 App. Div. (N. Y.) 363, 366–368, affd. without opinion, 308 N. Y. 805.

If it had not been for the very specific evidence that the selector lever was in the neutral position when LeBlanc left the automobile just before his injury and when Godish entered it after the accident, the cause of the accident would be wholly a matter of conjecture. Cf. the *Jastrzembski* case, 100 F. Supp. 465, 466. Various circumstances[3] suggest (1) that by inadvertence LeBlanc may have left the selector in a drive position or (2) that he may have inadequately applied the hand brake, or (3) that Godish's recollection of how he found the selector may have been inaccurate. It was for the jury, however, to determine whether the evidence about the selector position was accurate. Taken with the expert testimony about the transmission and linkage defects which could have caused this new, little-used automobile to move forward, it was open to the jury to conclude that the accident would not have occurred unless there had been negligence on Ford's part.

2.  Ford contends that the expert's testimony should not have been admitted. The testimony was given with re-

[3] These circumstances include (a) the absence of testimony showing any complaint about transmission defects by the purchaser of the automobile, and (b) the fact that immediately before and immediately after the accident the automobile apparently operated normally.

spect to technical matters as to which the jury would not have adequate knowledge as part of their ordinary experience. It stated possible causes of the accident upon the basis of circumstances set forth in a hypothetical question with reasonable accuracy and completeness. The witness indicated his opinion as to which of these causes was more probable. The testimony did not stand alone. Taken with the inferences reasonably to be drawn (with respect to a substantially unused automobile) from the occurrence itself, the testimony tended to assist the jury and was not "too inconclusive to afford a reasonable basis . . . for finding negligence" in the circumstances. Cf. *Stewart* v. *Worcester Gas Light Co.* 341 Mass. 425, 434–435.

Ford suggests that the hypothetical question erroneously omitted facts relating to (a) the manner in which LeBlanc started the automobile before the accident and let the motor run for half a minute, with the selector lever at the neutral position and with the hand brake on, and (b) the circumstance that "if one tried to start the motor . . . and the selector . . . was" in a drive position "the motor wouldn't start" (see fn. 1, *supra*). It was open to counsel for Ford to point out on cross-examination any omitted facts and then to inquire whether these facts affected the expert's opinion. *M. DeMatteo Constr. Co.* v. *Daggett*, 341 Mass. 252, 261. The facts omitted do not seem to us so significant that their omission from the hypothetical question made the question improper or required striking the answer. See *Potter* v. *John Bean Div. of Food Mach. & Chem. Corp.* 344 Mass. 420, 424. Cf. *Brown* v. *United States Fid. & Guar. Co.* 336 Mass. 609, 613–614.

3. We perceive no error in the refusal of the trial judge to strike a comment by the expert in the course of his explanation of the transmission mechanism. The witness had been asked to explain the mechanism and his comment was reasonable amplification of earlier testimony and relevant to his demonstration. The use, in the circumstances, of a model for such demonstration was within the trial judge's discretion. See *Commonwealth* v. *Butynski*, 339 Mass. 151, 153.

4.  One Carlson, associated with the dealer, had testified that his "firm had been a Ford dealer for forty-nine years . . . [and] a corporation since 1908." He also had testified that he bought new automobiles from Ford. Counsel for Ford then objected to certain somewhat leading questions by LeBlanc's attorney. The judge stated that he was "allowing the leading questions, understanding that this witness is under summons and . . . is the dealer of" Ford. Ford's counsel excepted to the comment, and the judge replied, "I do not say he's an authorized dealer. I say that, by his own admissions, he sells Ford . . . vehicles." No further objection was made and the judge could reasonably have thought that no further correction was requested. His casual remark was, perhaps, somewhat confusing and conceivably could have given an impression that the dealer was Ford's agent. In view, however, of the absence of renewed objection and in the light of the prior testimony that the firm was a corporation, a "Ford dealer," and a purchaser of Ford automobiles, the incident was not prejudicial in the circumstances.

*Exceptions overruled.*